1  Rosemary M. Rivas (SBN 209147)
   rrivas@finkelsteinthompson.com
2  Caitlyn D. Finley (SBN 286242)
   cfinley@finkelsteinthompson.com
3  **FINKELSTEIN THOMPSON LLP**
4  505 Montgomery Street, Suite 300
   San Francisco, CA 94111
5  Telephone: (415) 398-8700
   Facsimile (415) 398-8704
6

7  *Attorneys for Plaintiff*

8  [Additional Counsel Appear on Signature Page]



9                  **UNITED STATES DISTRICT COURT**

10                 **NORTHERN DISTRICT OF CALIFORNIA**

11

12 | Chris Misialek, Derivatively on
   | Behalf of AFFYMAX, INC.

13 |                                    Civil Action No.   CV 13   3832

14 |                    Plaintiff,        **SHAREHOLDER DERIVATIVE**
   |                                      **COMPLAINT FOR**
15 |        v.                            **CONTRIBUTION, BREACH OF**
   | JOHN A. ORWIN,                       **FIDUCIARY DUTY, WASTE OF**
16 | ROBERT F. VENTEICHER,                **CORPORATE ASSETS, AND**
   | JEFFREY H. KNAPP,                    **UNJUST ENRICHMENT**
17 | ANNE-MARIE DULIEGE,
   | HERB CROSS,
18 | KATHLEEN LAPORTE
   | TED W. LOVE,
19 | DANIEL K. SPIEGELMAN,
   | JOHN P. WALKER,
20 | CHRISTINE VAN HEEK,
   | KEITH R. LEONARD, JR., and
21 | HOLLINGS C. RENTON
22
23 |                    Defendants,
24 | -and-
25 | AFFYMAX, INC., a Delaware corporation,    **JURY TRIAL DEMANDED**
   |                    Nominal Defendant.
26
27
28

─────────────────────────────────────────────
                SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff, Chris Misialek, through counsel, submits this shareholder derivative action brought by plaintiff on behalf of nominal defendant Affymax, Inc. ("Affymax" or the "Company"), and alleges the following based upon personal knowledge as to their own acts, and information and belief as to all other matters.

### NATURE OF ACTION

1.      This is a shareholder derivative action brought for the benefit of Affymax against named officers and directors seeking to remedy Defendants' breaches of fiduciary duty that have caused substantial monetary losses to Affymax, waste of corporate assets, unjust enrichments, and have exposed it to even greater future losses, together with non-monetary injuries, including irreparable damage to its reputation and goodwill.

2.      Affymax was founded in 2001 and is a biopharmaceutical company with a single product: OMONTYS (peginesatide) Injection ("OMONTYS").  This action is brought as the result of breaches of fiduciary duty by certain of the Company's officers and directors relating to the flawed designed and improper implementation of the clinical trials of the company's flagship and only major product, OMONTYS. This action also concerns the breach of fiduciary duty through misrepresentation of the Company's financial position and financial outlook that was directly related to the success of its only major product. The Defendants ignored safety hazards revealed in Phase 3 of the clinical trials of OMONTYS and failed to structure the clinical trials in a way to gain adequate safety data to address the hypersensitivity reactions illustrated by the trials.

3.      The Defendants failed to properly disclose the hypersensitivity reactions to OMONTYS that were revealed in Phase 3 of the clinical trials to the investing public. Further, the Defendants continuously overstated Affymax's financial and business position related to the release of the drug

1

given the safety hazards revealed during the clinical trials and the lack of any additional major revenue streams outside of those revenues gained by the distribution of OMONTYS.

4.     The Defendants issued a press release on March 27, 2012 announcing the FDA approval of the drug and stating that "[T]he FDA's decision was based on a New Drug Application (NDA), which included results from two randomized, controlled, open-label, Phase 3 studies (EMERALD 1 and 2) that demonstrated the **safety and efficacy** of OMONTYS dosed once monthly, compared to epoetin dosed between one-to-three times per week (according to product labels), in maintaining hemoglobin (Hb) levels in anemic CKD patients on dialysis." (emphasis added)

5.     The Defendants also touted the drug's assignment of a reimbursement code, otherwise known as a Q-code by Medicare and Medicaid on April 13, 2012 and announced a supply agreement for the drug reached with Fresenius Medical Care North America on July 12, 2012, among other announcements giving the illusion of a flagship product that would produce large revenues for the Company for years to come.

6.     On February 23, 2013, Affymax announced a nationwide recall of OMONTYS due to fatal and life-threatening hypersensitivity reactions revealed in the post market analyses. As a result, the Company's stock value plummeted more than 85% in a single day. Prior to the recall announcement, the Defendants artificially inflated the public's perceived value of the stock by continuously releasing positive statements related to OMONTYS' marketing and distribution and then sold their shares in the company at a time when the stock price was at record highs, profiting in the amount of approximately $12 million.

7.     On March 18, 2013, the Company announced that it would "cull" approximately 230 of its employees or 75 percent of its workforce due to financial constraints, thereby reducing the Company's ability to grow and develop future products and revenues.  Affymax also announced on March 18, 2013

2

that it planned to retain a bank to evaluate strategic alternatives for the organization including a possible

merger, restructuring, sale of the company, winding-down of operations or bankruptcy proceedings.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. 1331 (federal question

jurisdiction) insofar as this action arises both under Section 10(b) of the Securities Exchange Act of

1934 (the "Exchange Act"), 15 U.S.C. 78j(b), pursuant to which there is a private right of action for

contribution, and Section 21D of the Private Securities Litigation Reform Act, 15 U.S.C. 78u-4, which

governs the application of any private right of action for contribution asserted pursuant to the Exchange

Act.

9.      Prior to Congress having enacted an express provision for contribution under Section 21D

of the Exchange Act, the United States Supreme Court recognized that a federal cause of action existed

for contribution pursuant to Section 10(b) of the Exchange Act and Rule 10b-5. *See Musick, Peeler &*

*Garrnett v. Employers Insurance of Wausau*, 508 U.S. 286 (1993). Defendants Affymax and Orwin et

al. have been named as defendants in a class action brought under Section 10(b) in this District. *Stevens*

*v. Affymax, Inc.,* et al., Civ. No. 4:13-00891 (N.D.Cal. 2013). Thus, this Court has original federal

question jurisdiction over the federal contribution claim alleged herein.

10.     This Court also has original subject matter jurisdiction over the state law claims asserted

herein pursuant to 28 U.S.C. 1367 (supplemental jurisdiction), since this statute provides that the district

court has supplemental jurisdiction over all other claims where, as here, they are so related to claims in

the action within the original jurisdiction of the Court, that they form part of the same case or

controversy.

11.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §1332, because the

matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is

between citizens of different states.

SHAREHOLDER DERIVATIVE COMPLAINT

12.   This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

13.   The Court has personal jurisdiction over each Defendant because each either is a corporation that conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes, or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

14.   Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because acts and offenses pertinent to the causes of action stated herein were committed in part in this jurisdiction.

## PARTIES

15.   Plaintiff Chris Misialek is a shareholder of Affymax and a citizen of North Dakota. Plaintiff was a shareholder at the time of the wrongdoing of which he complains and has continuously been a shareholder since that time.

16.   Nominal Defendant Affymax is a Delaware corporation headquartered at 4001 Miranda Avenue, Palo Alto, CA 94304. Affymax is a biopharmaceutical company with a focus on developing treatments for kidney disease and other serious illnesses. OMONTYS is its first product and is designed for the treatment of anemia due to chronic kidney disease in adult patients on dialysis. OMONTYS is a synthetic, peptide-based erythropoiesis stimulating agent, or ESA, designed to stimulate production of red blood cells.

17.   Defendant John H. Orwin ("Orwin") has served as a member of the Board of Directors of Affymax since February 2011 and was the Chief Executive Officer from February 2011 to May 15, 2013. Defendant Orwin served as the President and Chief Operating Officer of Affymax from April 2010 to January 2011. Defendant Orwin breached his duty of care to the Company by ignoring red flags

4

SHAREHOLDER DERIVATIVE COMPLAINT

related to the drug OMONTYS in the form of hypersensitivity reactions in Phase 3 of the clinical drug trials. Despite these red flags, Defendant Orwin made material misstatements as to the Company's positive outlook and projected earnings from a drug that he knew or should have known was not safe for use for which he is now a Defendant in class action litigation initiated based on allegations that Defendant Orwin violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") with his material misstatements and omissions in public disclosures. Defendant Orwin breached his fiduciary duty to Affymax by failing to institute proper internal controls to ensure the disclosure of material information related to Affymax's only product's safety. Defendant Orwin also engaged in trading when in possession of material, non-public information. While in possession of the adverse hypersensitivity reactions present in the Phase 3 clinical trials and not disclosed to the public, Defendant Orwin sold 249,453 shares of Affymax from which he benefited in the form of $4,529,708.30 in earnings.

18.     Defendant Herbert C. Cross ("Cross") has served as the Company's Chief Financial Officer from March 4, 2011 to June 6, 2013 and served as Vice President of Finance and Chief Accounting Officer since November 15, 2010.   Defendant Cross breached his duty of care to the Company by ignoring red flags related to the drug OMONTYS in the form of hypersensitivity reactions in Phase 3 of the clinical drug trials. Despite these red flags, Defendant Cross made material misstatements as to the Company's positive outlook and projected earnings from a drug that he knew or should have known was not safe for use for which he is now a Defendant in class action litigation initiated based on allegations that Defendant Cross violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") with is material misstatements and omissions in public disclosures. Defendant Cross breached his fiduciary duty to Affymax by failing to institute proper internal controls to ensure the disclosure of material information related to Affymax's only product's safety. Defendant

5

Cross also engaged in trading when in possession of material, non-public information. While in possession of the adverse hypersensitivity reactions present in the Phase 3 clinical trials and not disclosed to the public, Defendant Cross sold 300,000 shares of Affymax from which he benefited in the form of $195,000 in earnings.

19.     Defendant Robert Venteicher ("Venteicher") served as Senior Vice President of Technical Operations at Affymax, Inc., from June 2008 to March 31, 2013 and served as its Chief Technology Officer until March 31, 2013. Dr. Venteicher served as a Vice President of Technical Operations at Affymax, Inc., from August 14, 2007 to June 2008. Defendant Venteicher breached his duty of care to the Company by ignoring red flags related to the drug OMONTYS in the form of hypersensitivity reactions in Phase 3 of the clinical drug trials. Despite these red flags, Defendant Venteicher made material misstatements as to the Company's positive outlook and projected earnings from a drug that he knew or should have known was not safe for use. Defendant Venteicher breached his fiduciary duty to Affymax by failing to institute proper internal controls to ensure the disclosure of material information related to Affymax's only product's safety. Defendant Venteicher also engaged in trading when in possession of material, non-public information. While in possession of the adverse hypersensitivity reactions present in the Phase 3 clinical trials and not disclosed to the public, Defendant Venteicher sold 157,556 shares of Affymax from which he benefited in the form of $3,913,294.39 in earnings.

20.     Defendant Jeffrey H. Knapp ("Knapp") served as Chief Commercial Officer of Affymax since July 2006. Defendant Knapp breached his duty of care to the Company by ignoring red flags related to the drug OMONTYS in the form of hypersensitivity reactions in Phase 3 of the clinical drug trials. Despite these red flags, Defendant Knapp made material misstatements as to the Company's positive outlook and projected earnings from a drug that he knew or should have known was not safe for use. Defendant Knapp breached his fiduciary duty to Affymax by failing to institute proper internal

SHAREHOLDER DERIVATIVE COMPLAINT

controls to ensure the disclosure of material information related to its only products' safety. Defendant Knapp also engaged in trading when in possession of material, non-public information. While in possession of the adverse hypersensitivity reactions present in the Phase 3 clinical trials and not disclosed to the public, Defendant Knapp sold 137,754 shares of Affymax from which he benefited in the form of $2,777,582.77 in earnings.

21.    Defendant Anne-Marie Duliege ("Duliege") served as Chief Medical Officer of Affymax since July 2007 and prior to that served as Vice President, Clinical, Medical and Regulatory Affairs since 2004.  Defendant Duliege breached her duty of care to the Company by ignoring red flags related to the drug OMONTYS in the form of hypersensitivity reactions in Phase 3 of the clinical drug trials. Despite these red flags, Defendant Duliege made material misstatements as to the Company's positive outlook and projected earnings from a drug that she knew or should have known was not safe for use. Defendant Duliege breached her fiduciary duty to Affymax by failing to institute proper internal controls to ensure the disclosure of material information related to Affymax's only product's safety. Defendant Duliege also engaged in trading when in possession of material, non-public information. While in possession of the adverse hypersensitivity reactions present in the Phase 3 clinical trials and not disclosed to the public, Defendant Duliege sold 37,676 shares of Affymax from which she benefited in the form of $982,383.79 in earnings.

22.    Defendant Katheleen LaPorte ("LaPorte") served as a member of the Affymax Board since 2001 and a member of the Audit Committee since 2011.  Defendant LaPorte breached her duty of care to the Company by ignoring red flags related to the drug OMONTYS in the form of hypersensitivity reactions in Phase 3 of the clinical drug trials. Despite these red flags, Defendant LaPorte made material misstatements as to the Company's positive outlook and projected earnings from a drug that she knew or should have known was not safe for use. Defendant LaPorte breached her

SHAREHOLDER DERIVATIVE COMPLAINT

fiduciary duty to Affymax by failing to institute proper internal controls to ensure the disclosure of material information related to Affymax's only product's safety.

23.   Defendant Ted W. Love ("Love") served as Executive Vice President and Head of Research and Development since February 2010 and served as Executive Vice President and Head of Research & Development and Technical Operations since January 2011.  Defendant Love breached his duty of care to the Company by ignoring red flags related to the drug OMONTYS in the form of hypersensitivity reactions in Phase 3 of the clinical drug trials. Despite these red flags, Defendant Love made material misstatements as to the Company's positive outlook and projected earnings from a drug that he knew or should have known was not safe for use. Defendant Love breached his fiduciary duty to Affymax by failing to institute proper internal controls to ensure the disclosure of material information related to Affymax's only product's safety.

24.   Defendant John P. Walker ("Walker") served as a member of the Affymax Board since 2006. He has been a member of Affymax's Nominating and Corporate Governance Committee since July 2006, and a member of the Compensation Committee since 2007. Defendant Walker has served as the Chairman of the Compensation Committee since January 2008. From July 2006 until March 2008, Defendant Walker also served as a member of the Affymax Audit Committee. Defendant Walker breached his duty of care to the Company by ignoring red flags related to the drug OMONTYS in the form of hypersensitivity reactions in Phase 3 of the clinical drug trials. Despite these red flags, Defendant Walker made material misstatements as to the Company's positive outlook and projected earnings from a drug that he knew or should have known was not safe for use. Defendant Walker breached his fiduciary duty to Affymax by failing to institute proper internal controls to ensure the disclosure of material information related to Affymax's only product's safety.

SHAREHOLDER DERIVATIVE COMPLAINT

25.   Defendant Christine Van Heek ("Van Heek") served as a member of the Affymax Board since 2007. Defendant Van Heek breached her duty of care to the Company by ignoring red flags related to the drug OMONTYS in the form of hypersensitivity reactions in Phase 3 of the clinical drug trials. Despite these red flags, Defendant Van Heek made material misstatements as to the Company's positive outlook and projected earnings from a drug that she knew or should have known was not safe for use. Defendant Van Heek breached her fiduciary duty to Affymax by failing to institute proper internal controls to ensure the disclosure of material information related to Affymax's only product's safety.

26.   Defendant Keith R. Leonard ("Leonard") served as a member of the Affymax Board since 2007. Defendant Leonard breached his duty of care to the Company by ignoring red flags related to the drug OMONTYS in the form of hypersensitivity reactions in Phase 3 of the clinical drug trials. Despite these red flags, Defendant Leonard made material misstatements as to the Company's positive outlook and projected earnings from a drug that he knew or should have known was not safe for use. Defendant Leonard breached his fiduciary duty to Affymax by failing to institute proper internal controls to ensure the disclosure of material information related to Affymax's only product's safety.

27.   Defendant Hollings C. Renton ("Renton") served as a member of the Affymax Board since 2009. Defendant Renton breached his duty of care to the Company by ignoring red flags related to the drug OMONTYS in the form of hypersensitivity reactions in Phase 3 of the clinical drug trials. Despite these red flags, Defendant Renton made material misstatements as to the Company's positive outlook and projected earnings from a drug that he knew or should have known was not safe for use. Defendant Renton breached his fiduciary duty to Affymax by failing to institute proper internal controls to ensure the disclosure of material information related to its only products' safety.

9

## FLAWED CLINICAL TRIALS

28.     As Affymax's only product, the Company's success was exclusively reliant upon bringing OMONTYS successfully to market. Three phases of clinical trials were performed as part of the FDA and planned European regulatory approval process for OMONTYS. The Phase 3 trials, which are the basis of the allegations of wrongdoing herein, were designed to test the safety and efficacy of OMONTYS. Following the completion of the Phase 3 trials, the Defendants publicly reported that participants in the trial displayed hypersensitivities to the drug that included hypertension, flushing, shortness of breath, and itching. The Defendants failed to disclose that in Phase 3 clinical trials some subjects experienced much more serious reactions. This information was not publicized until the recall of the drug in February 2013.

29.     The Defendants failed to investigate or cause to be investigated further the serious hypersensitivities that were displayed by participants in the Phase 3 trials. As a result, on the Defendants' failure to disclose the full extent of hypersensitivities that participants in the Phase 3 trials experienced, OMONTYS was granted FDA approval March 27, 2012.

30.     Defendants continued to release positive information related to the company's financial well being, all of which was reliant on the success of their flawed and only product OMONTYS.

## IMPROPER STATEMENTS AND ACTIONS

31.     On December 7, 2011, Affymax issued a press release highlighting the positive "benefit/risk profile" of the drug that states as follows:

> "*We're encouraged by the panel's positive view of the benefit/risk profile* of peginesatide in the dialysis setting," said John Orwin, president and CEO of Affymax. "Anemia affects many patients in the dialysis setting, and we look forward to working with the FDA as they complete their evaluation of peginesatide. As a once-monthly treatment, peginesatide, if approved, has the potential to be an important option in the management of anemia in patients living with this condition."
>
> While the FDA is not bound by the recommendations of its advisory committees, their guidance will be considered by the FDA in its review of the New Drug Application (NDA) that was

10

submitted for peginesatide in May 2011. The scheduled Prescription Drug User Fee Act
(PDUFA) date for peginesatide is March 27, 2012.

"Today's ODAC vote represents an important step in the peginesatide New Drug Application
review process," said Azmi Nabulsi, MD, president, Takeda Global Research & Development
Center, Inc. "As we heard from the discussion today, limited therapeutic options are available for
the treatment of anemia in dialysis patients with chronic kidney disease. Affymax and Takeda
will continue efforts to make this alternative available to dialysis patients and the providers who
treat them." (emphasis added)

32.    On February 27, 2012, the Defendants touted their partner's submission of the drug for

approval for use in European markets in a press release entitled "Affymax to Receive $5 Million

Milestone Payment for Acceptance of European Marketing Authorization Application for Peginesatide"

and misled the public by failing to disclose the hypersensitivities revealed by the the participants in the

trials.  The release stated in pertinent part as follows:

"We are delighted with Takeda's execution on the European front and are encouraged by the
EMA acceptance of the MAA," said John Orwin, president and CEO of Affymax. "While we are
concurrently preparing for potential commercialization of peginesatide in the United States, we
are pleased that *progress is being made to potentially make the product available outside the
U.S.*" (emphasis added)

33.    On March 27, 2012, Affymax issued a press release in which they omitted the highly

relevant information related to the presence of fatal or life-threatening hypersensitivities in the Phase 3

trials. The release states in pertinent part:

[t]he U.S. Food and Drug Administration (FDA) approved OMONTYS® (peginesatide) Injection
for the treatment of anemia due to chronic kidney disease (CKD) in adult patients on dialysis.
OMONTYS is the only once-monthly erythropoiesis-stimulating agent (ESA) for anemia to be
made available to the dialysis patient population in the United States.

The FDA's decision was based on a New Drug Application (NDA), which included results from
two randomized, controlled, open-label, Phase 3 studies (EMERALD 1 and 2) that demonstrated
the safety and efficacy of OMONTYS dosed once monthly, compared to epoetin dosed between
one-to-three times per week (according to product labels), in maintaining hemoglobin (Hb)
levels in anemic CKD patients on dialysis. In these studies, the most commonly reported adverse
reactions were shortness of breath, diarrhea, nausea, cough and arteriovenous fistula site
complication.

34.    On April 9, 2012, Affymax again touted their partner Takeda's progress towards

achieving regulatory approval in Europe for the distribution and use of OMONTYS and failed to

SHAREHOLDER DERIVATIVE COMPLAINT

disclose the fatal and life-threatening hypersensitivities they were aware the drug was producing. By

doing so, they inaccurately represented the company's future profit possibilities and misled the public.

The release stated in pertinent part:

> Affymax, Inc. (Nasdaq: AFFY) today announced that it has received a $50 million development milestone payment from Takeda Pharmaceutical Company as part of the companies' exclusive global agreement to develop and commercialize OMONTYS® (peginesatide) Injection. The milestone was triggered by the U.S. Food and Drug Administration (FDA) approval of OMONTYS on March 27, 2012.

> This is in addition to the $5 million milestone payment the company received from Takeda that was triggered by the European Medicines Agency acceptance of the Marketing Authorization Application in February.

35.     On April 13, 2012, the Defendants furthered the perception that the Company and

shareholders would be benefiting from the widespread distribution and use of OMONTYS by issuing a

press release announcing the assignment of a Q-code by the Center for Medicare and Medicaid Services

for OMONTYS. The press release stated:

> [T]he Centers for Medicare and Medicaid Services (CMS) has granted a unique product reimbursement code, or Q-code, for OMONTYS® (peginesatide) Injection. The OMONTYS-specific billing code, Q2047, will help streamline the billing process for dialysis organizations using OMONTYS. This new Q-code will become effective on July 1, 2012. OMONTYS is the only once-monthly erythropoiesis-stimulating agent (ESA) for anemia available to the dialysis patient population in the United States.

> "We are very pleased with the level of interest in OMONTYS by providers, and the designation of this Q-code by CMS will help simplify their billing process for reimbursement when using this new once-monthly anemia treatment for chronic kidney disease (CKD) patients on dialysis," said John Orwin, chief executive officer, Affymax. "The ability of dialysis centers to receive timely reimbursement for OMONTYS is important for the dialysis community."

> According to Nicole Mowad-Nassar, vice president, marketing at Takeda, "Having received U.S. Food and Drug Administration (FDA) approval just last month, the CMS assignment of a reimbursement, or Q-code, is one more significant step towards making OMONTYS available to the healthcare providers who treat dialysis patients with anemia."

36.     On April 24, 2012, Affymax announced that OMONTYS was available for use on the

U.S. market in a press release entitled "OMONTYS (Peginesatide) Injection Now Available for Adult

12

SHAREHOLDER DERIVATIVE COMPLAINT

Chronic Kidney Disease (CKD) Patients on Dialysis in the United States". The release stated in pertinent part:

> "OMONTYS® (peginesatide) Injection is now available only for use in treating anemia due to chronic kidney disease (CKD) in adult patients on dialysis. OMONTYS is the only once-monthly erythropoiesis-stimulating agent (ESA) for anemia available to the dialysis patient population in the United States."

37.     On May 7, 2012, Affymax issued a press release further misleading the public about the financial and business outlook of the company in which the Chief Executive Officer stated as follows:

> "The year is off to a phenomenal start with the approval of OMONTYS on March 27," said John Orwin, chief executive officer of Affymax. "Since that time, we secured a product specific Q-code from CMS which will streamline reimbursement and also launched the product with two product configurations. *We look forward to reporting progress of OMONTYS adoption and integration by dialysis providers*."(emphasis added)

38.     On July 12, 2012 and August 8, 2012 Affymax again touted the unsustainable revenues of OMONTYS in press releases announcing supply agreements with Fresenius Medical North America and U.S. Renal Care Inc. The July 12, 2012 press release stated in pertinent part:

> The agreement, which ends in April 2013, allows Fresenius Medical Care North America to purchase OMONTYS for use in U.S. centers within its organization and provides for discounts and rebates on the product, subject to certain requirements. Fresenius Medical Care North America has stated that its initial plans are to adopt the product into more than 100 dialysis centers in the U.S. over the next few weeks, and then, based on its experience, evaluate the potential to expand to additional centers. Financial terms were not disclosed.
> "We are excited to partner with Fresenius Medical Care North America, one of the world's leading dialysis providers, *to offer a new therapeutic option for the treatment of anemia in its chronic kidney disease patients on dialysis*," said Nicole Mowad-Nassar, vice president, marketing at Takeda. (emphasis added).

> The August 8, 2012 release states in pertinent part:

> The agreement allows U.S. Renal Care to purchase OMONTYS for use within its organization and provides for discounts and rebates on the product, subject to certain requirements. U.S. Renal Care has indicated that they plan to initially evaluate OMONTYS in selected centers, and then, based on experience, evaluate the potential to expand to additional centers. Financial terms were not disclosed.

> "As we anticipated, *there is interest from some of the world's leading dialysis providers to offer a new therapeutic option for the treatment of anemia in chronic kidney disease patients on dialysis*," said Nicole Mowad-Nassar, vice president, marketing at Takeda.

SHAREHOLDER DERIVATIVE COMPLAINT

"*These centers are demonstrating an interest in offering new therapies* and showing their commitment to innovation," stated John Orwin, chief executive officer of Affymax. "*We intend to support their integration efforts* and believe OMONTYS will prove to be a once-monthly alternative in their centers moving forward." (emphasis added)

39.    On November 8, 2012, the Company released its third quarter 2012 earnings, crediting OMONTYS sales with increased revenues. Once again failing to provide the public with a realistic view of the Company's likely future revenues because the release failed to account for the loss of future revenues due to OMONTYS' deadly side effects. The release stated in pertinent part:

Affymax recognized total revenue for the quarter ended September 30, 2012, of $13.6 million compared to $13.2 million for the quarter ended September 30, 2011. Revenue for the quarter ended September 30, 2012 primarily consisted of a $10.4 million profit equalization payment earned from its partner, Takeda Pharmaceutical Company Limited (Takeda) related to OMONTYS®(peginesatide) Injection product sales during the period. OMONTYS net product sales, as provided by Takeda, were $15.0 million for the quarter. In addition, *Affymax earned a $2.25 million milestone payment from Takeda during the quarter as a result of the commercial progress achieved with OMONTYS during its product launch*. Revenue for the quarter ended September 30, 2011consisted of a $10 million regulatory milestone payment from Takeda and pre-approval research and development and commercialization expenses reimbursable by Takeda.

Research and development expenses for the quarter ended September 30, 2012, were $11.4 million compared to $14.9 million for the quarter ended September 30, 2011. The decrease was primarily due to reduced consultant and personnel-related costs as a result of the completion of both the filing of the OMONTYS New Drug Application with the U.S. Food and Drug Administration (FDA) in May 2011 and the preparation for an FDA advisory committee meeting which occurred in December 2011. These decreases were partially offset by clinical trial activity for the company's Phase 3b trial during the current quarter.

Selling, general and administrative expenses for the quarter ended September 30, 2012, were $26.2 million compared to $8.2 million for the quarter ended September 30, 2011. The increase was primarily due to increases in commercial and medical affairs costs, including personnel-related costs associated with the establishment of its commercial and medical affairs field organizations, as the company continues to execute on the launch and commercialization of OMONTYS.

40.    On January 3, 2013, Affymax issued a press release touting OMONTYS' assignment of a permanent J-code by CMS, reporting the high interest in the drug by the dialysis community, and the CMS's efforts to streamline the reimbursement process for use of the drug. Once again, the Company

SHAREHOLDER DERIVATIVE COMPLAINT

1   misled the public into believing that the drug's use would be sustainable and revenues would continue to

2   be derived from OMONTYS' availability on the market. The release states in pertinent part:

3
4   [T]he J-code assigned by the Centers for Medicare and Medicaid Services (CMS) for
    OMONTYS®(peginesatide) Injection is now effective. This permanent OMONTYS-specific
5   billing code, J0890, will continue to provide for streamlined reimbursement for dialysis
    organizations prescribing OMONTYS. OMONTYS is the only once-monthly erythropoiesis-
6   stimulating agent (ESA) for anemia available to the adult dialysis patient population with chronic
    kidney disease (CKD) in the United States (U.S.).

7
8   "We are excited by the strong level of interest in the dialysis community for OMONTYS,"
    said John Orwin, chief executive officer,Affymax. "We believe the J-code complements our
9   efforts to make this once-monthly therapy broadly available to the dialysis community, and
    importantly, to appropriate patients."

10
11  According to Nicole Mowad-Nassar, vice president, marketing at Takeda, "We are pleased to
    have an effective J-code in place approximately nine months following the approval of
12  OMONTYS."

13      41.     On January 7, 2013, the Company issued a press release announcing another supply

14  agreement entitled "Takeda and Affymax Announce Supply Agreement for OMONTYS (Peginesatide)

15  Injection with DSI Renal". The Company emphasized the future distribution of the drug without

16  disclosing the safety problems associated with the drug's use. The release stated in pertinent part:
17

18  Affymax, Inc.(Nasdaq: AFFY) today announced that Takeda Pharmaceuticals America,
    Inc. (TPA) has entered into a supply agreement for sourcing and supply of
19  OMONTYS® (peginesatide) Injection with DSI Renal, one of the largest dialysis providers in the
    United States (U.S.). OMONTYS is the only once-monthly erythropoiesis-stimulating agent
20  (ESA) for anemia available to the adult dialysis patient population with chronic kidney disease
    (CKD) in the U.S.
21

22  The agreement allows DSI Renal to purchase OMONTYS for use within its organization and
    provides for discounts and rebates on the product, subject to certain requirements. DSI Renal has
23  indicated that they plan to initially evaluate OMONTYS in selected centers, and then, based on
    experience, evaluate the potential to expand to additional centers. Financial terms were not
24  disclosed.
25

26  "We look forward to working with DSI Renal as they integrate OMONTYS into their dialysis
    centers," stated John Orwin, chief executive officer of Affymax. "With this agreement, we now
27  have supply agreements in place with five out of the six medium-sized dialysis organizations in
    the U.S."
28

15

SHAREHOLDER DERIVATIVE COMPLAINT

42.     For a period of almost fifteen months Affymax continuously released information to the investing public indicating a positive business outlook, future profit gains from OMONTYS, and future revenues to be derived from OMONTYS being sold in both the US and European market. However, the Company's only product had serious safety deficiencies that would eventually lead to the cessation of sales of the drug and enormous liabilities for the company.

43.     After almost fifteen months since the misleading statements to the public began, on February 23, 2013 Affymax admitted that their sole product was not safe. The Company issued a universal recall of the drug announced via press release. The release particularly noted the fact that there were hypersensitivities that were "*life-threatening or fatal*" associated with the drug that had not been released with any information concerning their clinical safety trials. The release stated in pertinent part:

> Affymax, Inc. (Nasdaq: AFFY) and Takeda Pharmaceutical Company Limited (Takeda) today have decided to voluntarily recall all lots of OMONTYS® (peginesatide) Injection to the user level as a result of new postmarketing reports regarding serious hypersensitivity reactions, including anaphylaxis, ***which can be life-threatening or fatal. The companies have been working actively with the U.S. Food and Drug Administration (FDA) which has indicated its agreement with this decision.*** The companies have also issued a letter to healthcare professionals indicating that no new or existing patients should receive OMONTYS.
>
> To date, ***fatal reactions have been reported in approximately 0.02% of patients*** following the first dose of intravenous administration. The reported serious hypersensitivity reactions have occurred within 30 minutes after such administration of OMONTYS. There have been no reports of such reactions following subsequent dosing, or in patients who have completed their dialysis session. Since launch, more than 25,000 patients have received OMONTYS in the post marketing setting. The rate of overall hypersensitivity reactions reported is approximately 0.2% with approximately a third of these being serious in nature including anaphylaxis requiring prompt medical intervention and in some cases hospitalization. The companies are actively investigating these cases. In the meantime, dialysis organizations are instructed to discontinue use. Customers will be provided instructions on how to return the product to the manufacturer for a refund.

44.     On February 25, 2013, Defendant Duliege stated in a conference call hosted by Affymax for investors and the media that the Company was aware of the occurrence of the hypersensitivities during the Phase 3 trials and that the "rate of hypersensitivity was about the same" in the Phase 3 trials

and the post market results. Defendant Duliege further stated that the clinical trials included serious hypersensitivity reactions.

45.    As a result of the recall and subsequent conference call analysts downgraded Affymax stock and the share price plummeted approximately 85%.

46.    Shortly thereafter on March 18, 2013 the Company announced it would fire approximately seventy-five percent of its workforce and engage in a restructuring to reduce operating costs and focus on meeting the safety requirements of OMONTYS. The Company further disclosed that it was exploring options including bankruptcy, sale of the company, or winding down operations.

## INSIDER TRADING

47.    The Defendants' sale of stock exhibits a desire to profit from high stock prices prior to the inevitable plummet of the shares' values when the truth relating to the Company's only product's safety could no longer be hidden from the public.

48.    Defendants were all members of the Board of Directors or in Officer positions that gave them access to material, non-public information relating to the safety shortfalls of OMONTYS and the destructive impact it would have upon Affymax's value should it be discovered.

49.    Defendant Orwin was the Company's Chief Executive Officer and a member of the Board of Directors during the period of wrongdoing. His management position and his access as a Board member to any information in the Company's possession guaranteed his access to information relating to the safety hazards associated with OMONTYS. Defendant Orwin sold none of his holdings in Affymax in the equivalent amount of time leading up to the period of wrongdoing, indicating that his sale of nearly 70% of his holdings during the period of wrongdoing was done knowingly and in anticipation of a temporarily high share price. He sold his shares while in possession of information not available to the public that he concealed from the market by approving press releases and issuing

17

statements touting OMONTYS' positive outlook. Defendant Orwin made false statements that increased the price of the stock and sold his shares for approximately seven times the value of the holdings after the truth about OMONTYS's safety hazards were revealed. As a result of his trading on insider information, Defendant Orwin received consideration in the amount of $4,429,708.30 for his holdings during the period of wrongdoing.

50.    Defendant Knapp was the Company's Chief Commercial Officer during the period of wrongdoing. His management position and his access to any information in the Company's possession guaranteed his access to information relating to the safety hazards associated with OMONTYS. Defendant Knapp sold none of his holdings in Affymax in the equivalent amount of time leading up to the period of wrongdoing, indicating that his sale of approximately 88% of his holdings during the period of wrongdoing was done knowingly and in anticipation of a temporarily high share price. He sold his shares while in possession of information not available to the public that he concealed from the market by approving press releases and issuing statements touting Affymax's positive outlook. As a result of his trading on insider information, Defendant Knapp received consideration in the amount of $2,777,582.27 for his holdings during the period of wrongdoing.

51.    Defendant Venteicher was the Company's Senior Vice President of Technical Operations during the period of wrongdoing. His management position and his access to any information in the Company's possession guaranteed his access to information relating to the safety hazards associated with OMONTYS. Defendant Venteicher sold none of his holdings in Affymax in the equivalent amount of time leading up to the period of wrongdoing, indicating that his sale of approximately 86% of his holdings during the period of wrongdoing was done knowingly and in anticipation of a temporarily high share price. He sold his shares while in possession of information not available to the public that he concealed from the market by approving press releases and issuing statements touting Affymax's

18

positive outlook. Defendant Venteicher sold his shares for more than ten times the value of the holdings after the truth about OMONTYS' safety hazards were revealed. As a result of his trading on insider information, Defendant Venteicher received consideration in the amount of $3,913,294.39 for his holdings during the period of wrongdoing.

52.     Defendant Duliege was the Company's Chief Medical Officer and in charge of Research and Clinical Development during the period of wrongdoing. Her management position gave her access to any information in the Company's possession related to OMONTYS and guaranteed her access to information relating to the safety hazards associated with OMONTYS. Defendant Duliege sold only 10,142 of her shares in Affymax in the equivalent amount of time leading up to the period of wrongdoing, indicating that her sell of nearly 60% of her holdings during the period of wrongdoing was done knowingly and in anticipation of a temporarily high share price. She sold her shares while in possession of information not available to the public that she concealed from the market. Defendant Duliege sold her shares for more than eight times the value of the holdings after the truth about OMONTYS's safety hazards were revealed. As a result of her trading on insider information, Defendant Duliege received consideration in the amount of $982,383.79 for her holdings during the period of wrongdoing.

53.     Defendant Cross was the Company's Chief Financial Officer during the period of wrongdoing. His management position and his access to any information in the Company's possession guaranteed his access to information relating to the safety hazards associated with OMONTYS. Defendant Cross sold none of his holdings in Affymax in the equivalent amount of time leading up to the period of wrongdoing, indicating that his sell of nearly 60% of his holdings during the period of wrongdoing was done knowingly and in anticipation of a temporarily high share price. He sold his shares while in possession of information not available to the public that he concealed from the market

19

by approving press releases and issuing statements touting Affymax's positive outlook. Defendant Cross sold his shares for almost seven times the value of the holdings after the truth about OMONTYS's safety hazards were revealed. As a result of his trading on insider information, Defendant Cross received consideration in the amount of $495,000.00 for his holdings during the period of wrongdoing.

## DERIVATIVE ALLEGATIONS

54.     Plaintiff incorporates by reference and re-alleges the allegations set forth above.

55.     Plaintiff brings this action derivatively in the right and for the benefit of Affymax to redress injuries suffered, and to be suffered, by Affymax as a direct result of Defendants' breaches of fiduciary duty.

56.     Plaintiff owns and owned common stock of Affymax during the period of wrongdoing.

57.     In February 2013, Affymax disclosed what it then characterized as a "voluntary recall" of OMONTYS, due to hypersensitivities that were deemed to be life-threatening or fatal.

58.     Defendants knew or were reckless in not knowing that the Phase 3 clinical trials of the drug OMONTYS indicated that participants experienced hypersensitivities to the drug that were life-threatening or fatal.

59.     Rather than expending the necessary time and expense to alter the drug to ensure that it was safe for the public and would continue to be safe going forward, Defendants concealed these findings and moved the drug to market, thereby breaching their fiduciary duty of loyalty to the Company.

60.     As a direct result of this concealing behavior, the drug was taken to the market in an unsustainable form with the Defendants touting the drug's advancement on the market, its supply deals to distribute the drug, and the drug's safety for a period of nearly fifteen months.

SHAREHOLDER DERIVATIVE COMPLAINT

61.     Defendants LaPorte, Love, and Spiegelman were members of the Audit Committee and breached their duty of care to the Company by approving press releases, statements, and filings that provided false information and impressions on the public about the company's financial outlook and future revenues.  As members of the Audit Committee they knew or were reckless in not knowing about the safety hazards related to the Company's only product.

62.     Defendants Orwin, Renton, Van Heek, LaPorte, Leonard, Love, Spiegalman and Walker were members of the Board of Directors and breached their duty of loyalty to the Company by failing to ensure that additional clinical testing and development was performed on OMONTYS to make it a sustaining product that was safe for the market. These Defendants also breached their duty of care in failing to put in place adequate internal controls to ensure the dissemination of adequate information to the investing public regarding OMONTYS' safety hazards.

63.     As a result of the wrongdoing engaged in by the Officers and Directors of Affymax, the Company will face numerous damages including, but not limited to, costs of the recall of the drug, liability to victims of the drug that suffered these life-threatening or fatal sensitivities, loss of reputation, loss of goodwill, and damages and legal expenses incurred due to the numerous lawsuits filed against the Company. Further, the Company will face enormous expense in correcting and promoting OMONTYS in the marketplace so that market confidence may be restored in the drug.

64.     Affymax's recall will result in substantial and unexpected expenditures, destruction of product inventory, loss of sales, lost consumer confidence and unavailability of the product for some time. The recall reduces the Company's profitability and cash flow to a non-existent level given that the drug is the Company's only product.

65.     The recall also subjects the Company to product liability claims. A product liability judgment against or agreement to settle a product liability claim could result in substantial and

21

SHAREHOLDER DERIVATIVE COMPLAINT

unexpected expenditures, which would reduce profitability and cash flow. In addition, even if product liability claims are not successful or are not fully pursued, these claims could be costly and time-consuming and may require management to spend time defending the claims rather than operating the Company.

66.     Defendants violated numerous ethical policies by failing to make complete and accurate disclosures and to comply with all laws.

67.     Defendants' misconduct has already caused Affymax to be the subject of multiple federal securities class actions, exposing the Company to serious risk of liability for massive monetary damages.

## **THE FUTILITY OF DEMAND**

68.     Plaintiff has not made any demand on the Board of Affymax to institute this action because any demand would be a useless and futile act because of the wrongful acts complained of show a wholesale abandonment by a majority of the directors of their fiduciary duties of due care and loyalty.

69.     The Board currently consists of the following six directors: John Orwin, Hollings Renton, Daniel Spiegelman, Christine Van Heek, John Walker, and Richard Brenner.

70.     The wrongdoing occurred under the auspices of the majority of the Board and the majority of the Board was engaged in insider trading during the period of wrongdoing.

71.     Defendant Orwin was the Chief Executive Officer of the Company during all relevant times and provided false statements and profited more than $4 million dollars from the false information he released by quoted statements or were released by the Company under his supervision.

72.     Only one of the current Board members, Richard Brenner, was not a member of the Board during the period of wrongdoing. Thus, the majority of the Board engaged in the complained of misconduct or completely abdicated their responsibility to oversee the Company's operations, thereby allowing the Company to engage in illegal and/or improper conduct that rendered the Company's public

SHAREHOLDER DERIVATIVE COMPLAINT

disclosures misleading and subjecting it to shareholder class actions, potential product liability lawsuits, loss in almost all revenue, increased regulatory scrutiny, lost goodwill, and customer confidence. Therefore, demand upon the Board of Affymax that its members sue themselves would prove futile because it is obvious that the Defendant will not do so, and have not done so.

73.    Directors of a Delaware corporation have a fiduciary duty to act loyally and in good faith to oversee its business and affairs and to assure that effective policies, procedures, and systems are in place to prevent, detect and promptly address, and terminate business practices that are unlawful or harmful to the company. As a fiduciary, each director must in good faith bring to bear his or her knowledge, skill, experience, and expertise in the fulfillment of their fiduciary duties.

## FIRST CAUSE OF ACTION

### (For Contribution For Violations of §10(b) of the 1934 Act and Rule 10b-5 and 21D of the Exchange Act Resulting in Waste of Corporate Assets)

74.    Plaintiff incorporates by reference and repeats and reasserts all preceding allegations.

75.    During the Class Period (December 8, 2011-February 22, 2013) alleged in the Class Action, Defendant Orwin at a minimum disseminated or approved the false statements specified above, which he knew was misleading or deliberately disregarded that they were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

76.    Defendant violated §10(b) of the 1934 Act and Rule 10b-5 in that he:

a.   employed devices, schemes, and artifices to defraud;

b.   made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c.  engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchased of Affymax common stock during the Class Period.

77.    It is alleged in the Securities Class action that the Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Affymax common stock. It is further alleged that Plaintiff and the Class would not have purchased Affymax common stock at the price they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

78.    If Affymax is liable to the Class in the Securities Class Action, then the Class Action Individual Defendants are liable to the Company for contribution.

## SECOND CAUSE OF ACTION

### (Against All Defendants for Breach of Fiduciary Duties)

79.    Plaintiff incorporates by reference and reasserts all preceding allegations.

80.    As Directors and/or Officers of Affymax, the Defendants owed Affymax the highest obligations of loyalty and due care. Defendants breached these fiduciary duties for the reasons set forth in the preceding sections, including knowingly or recklessly participating in the Company's issuance of, or allowing the Company to issue, materially false and misleading statements to the investing public about its financial results and prospects to consumers about the safety of its products.

81.    These actions could not have been a good faith exercise of prudent business judgment.

82.    The insider trading of Defendants Orwin, Venteicher, Knapp, Duliege and Cross breached their duty of loyalty to the Company and its shareholders. These Defendants profited immensely from trading based on proprietary, non-public information relating to the sustainability of the Company's only drug and the Company's future revenues and business outlook.

24

SHAREHOLDER DERIVATIVE COMPLAINT

83. Defendants Laporte, Love, and Spiegelman breached their duty of loyalty to the Company by approving press releases, statements, and filings that included material misstatements and omissions relating to the Company's only product's safety and the sustainability and business outlook of the Company.

84. Defendants Orwin, Venteicher, Knapp, Duliege, and Cross disregarded red flags produced by the OMONTYS Phase 3 Clinical trials, failed to ensure proper controls were in place within the company to achieve the dissemination of such information, and made improper statements about the business outlook of the Company and revenue sustainability.

85. As a direct and proximate result of Defendants' breaches of fiduciary duties, Affymax has suffered and will continue to suffer significant damages, as Defendants have exposed the Company to the risk of incurring significant legal liability in pending securities fraud litigation by shareholder, potential product liability litigation consumers and or/legal costs to defend itself. In addition, Affymax has suffered and will continue to suffer significant financial losses due to the recall, loss of goodwill, and reputation.

86. The full financial impact of the recalls has yet to be fully quantified. The harm to the Company's reputation with consumers and with regulatory agencies is still unknown.

### THIRD CAUSE OF ACTION

### (Against All Defendants for Unjust Enrichment)

87. Plaintiff incorporates by reference and repeats and reasserts all preceding allegations.

88. As a result of their wrongdoing, Defendants were unjustly enriched in the form of executive compensation, including, but not limited to, salaries, bonuses, stock options, and benefits paid to them while employed by Affymax and thereafter.

89. Such compensation was provided to them despite the fact that they were breaching their duties of loyalty and care to the company, trading on material, non-public information, failing to disclose to the investing public the true sustainability of their revenue stream, and violating various federal and state laws.

25

SHAREHOLDER DERIVATIVE COMPLAINT

90. Defendants Orwin, Venteicher, Knapp, Duliege, and Cross engaged in insider trading by making trades based on material, non-public information and profited in a combined excess of $12 million. Thus, they were unjustly enriched by their illegal acts and abuse of inside information.

91. Plaintiff, as a shareholder and representative of Affymax, seeks restitution, an order restoring all profits gained by Defendants to the Company including, but not limited to, executive compensation and profits from insider trading.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Defendants' breaches of fiduciary duty, waste of corporate assets, and unjust enrichment;

B. Directing Defendants to take all necessary actions to reform and improve Affymax's corporate governance and internal procedures, including, but not limited to, increasing internal controls relating to disclosures and internal policies to prevent future insider trading;

C. Awarding Affymax restitution from Defendants, and each of them individually, and ordering the disgorgement of all profits, benefits and other compensation obtained by Defendants while they were in breach of fiduciary duties, including, but not limited to, gains from insider trading;

D. Assessing damages in contribution against Defendants;

E. Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting Defendants' assets so as to assure that Plaintiff on behalf of Affymax has an effective remedy;

F. Awarding Plaintiff costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees, and other costs and disbursements; and

G. Awarding Plaintiff such other and further relief as may be just and proper under the circumstances.

SHAREHOLDER DERIVATIVE COMPLAINT

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: August 19, 2013

**FINKELSTEIN THOMPSON LLP**

Rosemary M. Rivas
Caitlyn D. Finley
505 Montgomery Street, Suite 300
San Francisco, CA 94111
Telephone: (415) 398-8700
Facsimile (415) 398-8704

L. Kendall Satterfield
Michael G. McLellan
Elizabeth R. Makris
Finkelstein Thompson LLP
James Place
1077 30th Street, NW
Suite 150
Washington, D.C. 20007
Telephone: (202) 337-8000
Facsimile: (202) 337-8090

SHAREHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, Chris Misialek, the undersigned, certify that I have read the foregoing complaint and know its contents.  I am a party to this action.  The matters described in the foregoing complaint are true to my own knowledge and belief except as to those matters stated on information and belief, and as to those matters I believe them to be true.  I hereby declare under penalty of perjury under the Federal Rules of Civil Procedure that the foregoing is true and correct.

Dated: _8 - 8_____ , 2013

_Chris Misialek_____

Chris Misialek